**IN RE: POLAROID CORPORATION, et al, Debtors.**

(includes: Polaroid Holding Company; Polaroid Consumer Electronics, LLC; Polaroid Capital, LLC; Polaroid Latin America I Corporation; Polaroid Asia Pacific LLC; Polaroid International Holding LLC; Polaroid New Bedford Real Estate, LLC; Polaroid Norwood Real Estate, LLC; Polaroid Waltham Real Estate, LLC)

John R. Stoebner, Trustee, Plaintiff,

v.

PNY Technologies, Inc., Defendant.

JOINTLY ADMINISTERED UNDER CASE NO. 08–46617
Court File Nos: 08–46621 (GFK) 08–46620 (GFK) 08–46623 (GFK) 08–46624 (GFK) 08–46625 (GFK) 08–46626 (GFK) 08–46627 (GFK) 08–46628 (GFK) 08–46629 (GFK)
ADV 10–4595

United States Bankruptcy Court, D. Minnesota.

Signed December 30, 2013

James A. Lodoen, Jeffrey D. Smith, Lindquist & Vennum PLLP, Minneapolis, MN, for Debtors.

## REPORT AND RECOMMENDATION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT, AS TO COUNT TWO OF PLAINTIFF'S COMPLAINT

Gregory F. Kishel, Chief United States Bankruptcy Judge

This adversary proceeding came before the undersigned bankruptcy judge on cross-motions for summary judgment on Count Two of the Plaintiff's amended complaint. The Plaintiff ("the Trustee") appeared personally and by his attorneys, Ralph V. Mitchell and Tyler D. Candee. The Defendant ("PNY") appeared by its attorneys, David J. Adler and Robert T. Kugler. Count Two is not a core proceeding in the underlying bankruptcy cases, but it is a related proceeding subject to the federal bankruptcy jurisdiction. Because PNY would not consent to entry of judgment at the order of a bankruptcy judge, the following report and recommendation is made to one of the district judges for this district pursuant to 28 U.S.C. § 157(c)(1). On the full record made for the motions,

## INTRODUCTION

This adversary proceeding arises out of the bankruptcy cases of the Polaroid Corporation and its affiliated companies. Through intermediate holding companies, one Thomas J. Petters acquired the assets of the Polaroid enterprise in 2005. He formed successor-companies to hold the assets, and then relocated the operation to Minnesota. By that time, the Polaroid Corporation and Polaroid Consumer Electronics, LLC ("PCE") functioned mainly to parlay the Polaroid brand-identity into the retail marketplace, through the licensing of the use of distinctive brands, trademarks, trade dress, and logos associated with the name, to third parties that used them on consumer goods for retail sale.[1]

Tom Petters was arrested and charged with federal criminal offenses in early October, 2008. His assets were put under a receivership in the United States District Court for the District of Minnesota, ancillary to the federal criminal proceedings.

Among those assets were Tom Petters's ownership interests in two holding companies, including the one through which he held the post-acquisition Polaroid Corporation and its affiliates. The receiver put the two—Petters Company, Inc. and Petters Group Worldwide, LLC—into Chapter 11 in mid-October, 2008. The Polaroid Corporation continued its freestanding business operations under preexisting management, though subject to the second-level oversight of the receivership and bankruptcy processes for its ultimate and intermediate owners. Ultimately, on December 18, 2008, the management of the Polaroid Corporation and its affiliates put these companies into reorganization under Chapter 11.

A sale of the assets of the Polaroid-going concern was conducted and court-approved in April, 2009. The underlying bankruptcy cases were converted to ones for liquidation under Chapter 7 on August 31, 2009.

---

1. Several years previously, the original Polaroid enterprise had stopped manufacturing and actively promoting its legacy, film-based photography products. Under Tom Petters's ownership, there was some effort toward developing digital-format versions of the classic Polaroid "instant photography" products. However, that did not come to fruition during the period of Petters's ownership.

The Plaintiff in this adversary proceeding is the trustee of the Polaroid debtors' bankruptcy estates. This adversary proceeding is part of his effort to liquidate the remaining assets of the estate and to recover pre-petition transfers avoidable under Chapter 7 of the Bankruptcy Code.

PNY is a New Jersey-based concern. It was a party to a brand licensing agreement and a support services agreement with the Polaroid Corporation before the bankruptcy filings. The Trustee has sued PNY (Count One) to avoid pre-petition transfers alleged to have been preferential (payments from PNY to one of the Debtors on invoices); and (Count Two) to liquidate an asset of the estate (by asserting a claim for royalties under license alleged to have been owing to the Polaroid Corporation for times before and after the bankruptcy filings).[2]

### JURISDICTION AND JUDICIAL AUTHORITY

█ In his complaint, the Trustee invoked the bankruptcy jurisdiction of the federal courts under 28 U.S.C. § 1334(b), over all counts of his complaint.[3] PNY does not deny that the bankruptcy jurisdiction lies, and it does indeed. The Plaintiff's request for avoidance of transfers and disallowance of claims under Counts One and Three "arise under" the Bankruptcy Code. *In re Farmland Industs., Inc.,* 567 F.3d 1010, 1018 (8th Cir.2009) (claims "arising under" are "those proceedings that involve a cause of action created or determined by a statutory provision of"

the Bankruptcy Code). As a suit to liquidate and garner assets into the estate, his action under Count Two to recover on a claim for contractual entitlements is certainly a proceeding "related to" the underlying bankruptcy case(s).

In his amended complaint [Dkt. No. 4, ¶ 4], the Trustee properly classifies his request for avoidance and disallowance as core proceedings; 28 U.S.C. §§ 157(b)(2)(F) and 157(b)(2)(B) are directly on-point. This allows entry of final judgment on their adjudication by the order of a bankruptcy judge. 28 U.S.C. § 157(b)(1).

The Trustee classifies Count Two, his action on the claim for royalties, as a "state-law claim for breach of contract," and hence describes it as "non-core." This concession is properly founded in the basic framework for adjudication in bankruptcy cases. Count Two is a claim under law to obtain one's due on breach—i.e., a failure by a contractual counterparty to perform. As such, Count Two is not materially different from *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), which is considered to be the classic third-party action that has a relationship to a bankruptcy case but which does not directly involve one of the core functions of bankruptcy in the adjustment of the debtor-creditor relationship. For the purposes of jurisdiction and judicial administration, however, the correct statutory phrase for the classification is not "non-core," but rather a "civil proceeding ... related to [a]

**2.** In a third count, the Trustee sought to have PNY's filed claim in the underlying bankruptcy case(s) disallowed pursuant to 11 U.S.C. § 502(d), until PNY had paid in full any amount for which it was adjudged alliable in avoidance.

**3.** 28 U.S.C. § 1334(b) provides, in pertinent part:

...notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under [the Bankruptcy Code], or arising in or related to cases under [the Bankruptcy Code].

case[ ] under" the Bankruptcy Code—or in the shorthand-parlance of bankruptcy, a related proceeding.[4]

As to Count Two, a related proceeding, neither side complied with the pleading requirements for consent to entry of final judgment at the order of a bankruptcy judge. *See* Fed. R. Bankr. P. 7008(a) (as to complaint, counterclaim, cross-claim, or third-party complaint) and 7012(b) (as to responsive pleadings). The Defendant's pleading was especially defective, being a vague, wholly generic boilerplate denial of sufficient information. [Dkt. No. 12, ¶ 4].

The court noted that deficiency on the record at a hearing, and addressed it in a later directive to the parties. Order re: Consent Under 28 U.S.C. § 157(c)(2) and Fed. R. Bankr. P. 7008(a) and 7012(b) [Dkt. No. 31].[5] In response, the Trustee's counsel filed a consent to entry of judgment on Count Two on order of the bankruptcy judge [Dkt. No. 32]. PNY's counsel refused to consent [Dkt. No. 34].

Thus, the final disposition of Count Two must be made on order of a district judge. On a full review of the record on these cross-motions, and on the conclusion that the record supports granting the Trustee's motion, this submission is thus made in the form of a report and recommendation, 28 U.S.C. § 157(c)(1).[6]

## MOTIONS AT BAR

Some four months after the Trustee commenced this adversary proceeding, PNY filed a motion for dismissal. It did so pursuant to a "procedures order" that had been entered to generally govern the Trustee's litigation in the underlying cases. Some six weeks after that, the parties stipulated to the withdrawal of PNY's motion and the submission of cross-motions for summary judgment as to Count Two [Dkt. No. 11].

PNY filed its motion first [Dkt. No. 15]. As Rule 56(a) requires,[7] it opened by asserting that there was "no genuine dispute as to material fact." It argued that a judgment on Count Two entirely in its favor was merited because the Trustee had no legal right to collect the royalties that were the subject of that count. As PNY would have it, those rights were not property of the bankruptcy estate(s), having been assigned to PLR Holdings, LLC ("PLR"), the buyer of the Polaroid assets under the Asset Purchase Agreement for the May, 2009 sale.

---

4. The syntactic sense of the words "non-core" could also include proceedings completely alien to the bankruptcy process or a pending bankruptcy case—which would put them outside the bankruptcy jurisdiction, and thus not to be brought in the bankruptcy court at all.

5. The original caution was prompted by the pendency before the Supreme Court of the appeal from *In re Marshall,* 600 F.3d 1037 (9th Cir.2010). The Supreme Court's issuance of *Stern v. Marshall,* 564 U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011) prompted the issuance of the order.

6. In its original motion for summary judgment, PNY asserted that "the Court lacks jurisdiction to determine the breach of contract action" as another ground for "dismiss-

al." Notice of Motion for Partial Summary Judgment by PNY Technologies, Inc. [Dkt. No. 15], 8. The thought here was entirely off-base, founded as it was on a misunderstanding of the statutory and constitutional framework for adjudication in bankruptcy cases. As the foregoing analysis shows, the bankruptcy jurisdiction *does* lie over Count Two. The rest is a matter of the "division of labor" in the exercise of that jurisdiction. *Stern v. Marshall,* 564 U.S. at ——, 131 S.Ct. at 2620 (Roberts, C.J.). And, that division is carried out in the current exit-posture of the proceedings before the originally-assigned bankruptcy judge.

7. Fed. R. Bankr. P. 7056 makes Fed. R. Civ. P. 56 applicable to adversary proceedings.

This issue, PNY posited, could be reached and decided on simple reference to documents—the original contracts that created the right to the royalties, and the Asset Purchase Agreement. Hence, it argued, its right to "judgment as a matter of law," Rule 56(a), could be determined without having to make findings on contested evidence.

The Trustee's motion followed soon after. The Trustee countered PNY's contract-based theory head-on, but he referred to provisions of the Asset Purchase Agreement other than those on which PNY relied. The Trustee argued that the bankruptcy estate(s) retained the right to collect the royalties identified in Count Two, and that there were unpaid royalties indisputably owing as to which he was entitled to judgment.

The Trustee also presented evidentiary materials to support the entry of judgment in a specific amount. He asserted that the factual content of these documents was not subject to controversy from PNY, because PNY itself had generated most of them. Through them, he argued, the amount of a judgment was established as a matter of law, under the simple terms of the original contract.

The Trustee raised another issue in his motion for summary judgment, PNY's right to its pleaded affirmative defense of setoff which would apply the claim that PNY was maintaining against the bankruptcy estate(s) against any judgment in the Trustee's favor. In preemptive fashion, the Trustee moved for summary judgment on this defense. He sought to bar it, on the argument that the claim in suit here and the claim asserted against the estate(s) lacked mutuality.

This led to responsive dithering from PNY, as to whether disposition on summary judgment was appropriate after all. By the time of oral argument, PNY's counsel was demanding an opportunity for discovery into factual matters on several fronts: whether the Polaroid Corporation–PNY contractual relationship had been assumed and assigned to PLR pursuant to the Asset Purchase Agreement or not; whether a right to recover unpaid royalties accrued before the sale had passed to PLR with the contract, or stayed with the estate(s); and whether and in what amount a judgment in favor of the Trustee should be subject to reduction by setoff or (newly-asserted and not pleaded) recoupment. It was a curious retreat from the rectitude and projected simplicity of PNY's original request for summary judgment in its favor, in respects a near-reversal of tone and position.

These motions partially overlap in their substantive scope, and each side's responses to the other's motion ended up hitting all of the issues raised between the two. Thus, the motions need not be analyzed *seriatim*. In the end, the structure of relevant rights under three different contractual undertakings, and the most basic of undisputed material facts, merit grant of judgment to the Trustee. He is not entitled to judgment in the full amount he demands, though.

## RIGHTS AND LIABILITIES: FOUNDATION IN CONTRACT

The parties' dispute has its origins in business relationships between the Polaroid enterprise and PNY that began in 2006. It is important to note at the outset that both the Polaroid Corporation *and* PCE were involved and active in that ongoing relationship; but only the Polaroid Corporation was a signatory to the two contracts that created and structured the relationship.

On July 19, 2006, the Polaroid Corporation and PNY, as named parties, entered a "Brand License Agreement" ("the BLA").[8] Under the BLA, PNY was granted the right to use the licensed trademarks and other items of the Polaroid Corporation's intellectual property on particular types of consumer merchandise and in connection with their sale, in specified geographic areas. The term of the BLA was to run through June 30, 2010.

PNY was to give several types of consideration for the license, including the payment of royalties. A minimum quarterly royalty was fixed by a table; it stepped up in amount from that due for a first quarter ending October 31, 2006. PNY was to submit to the Polaroid Corporation quarterly reports of its net sales of Polaroid-branded merchandise. The actual royalty payment was based on net sales volume, against a multiplier of three percent. That amount would be payable, with the contractual minimum as the floor for the Polaroid Corporation's entitlement. BLA [attached as Exh. 5 to Declaration of Tyler D. Candee, Dkt. No. 18, CM/ECF pp. 88–116], §§ 1 and 4, 1 and 4–6.

On April 6, 2007, the Polaroid Corporation and PNY entered a "Support Services Agreement" ("the SSA").[9] This agreement opens with an acknowledgment that the parties were already parties to the BLA and were entering the SSA "to provide for the rights and responsibilities of each of them with regard to a specific sales opportunity involving certain PNY products bearing the Polaroid brand." SSA [Exh. G–1 to Declaration of James Dolan in Support of Plaintiff's Motion for Summary Judgment, filed under Dkt. No. 16], 1. The SSA identifies the "specific sales opportunity" as the placement of Polaroid-branded merchandise with the Target Corporation for resale, using a preexisting and well-established relationship that the Polaroid enterprise had developed with that major retailer.[10] *Id.*, ¶ 1(a).

Under the SSA, the signatories created a structure through which the Polaroid Corporation was a named intermediary for the placement of PNY-produced and Polaroid-branded merchandise with the Target Corporation. Under the SSA, the Polaroid Corporation was to:

1. receive purchase orders from the Target Corporation for Polaroid-branded products;

2. promptly create and transmit a corresponding purchase order to PNY, for the same quantity and type of such product;

3. invoice the Target Corporation for its purchase of the goods;

4. remit the amount of Target Corporation's ensuing payment to PNY, less a one percent service fee; and

5. notify PNY promptly of any notice from the Target Corporation "as to the cancellation of any [Target Cor-

---

**8.** PNY admits that it was a party to the BLA and that the BLA is enforceable pursuant to its terms. Answer and Affirmative Defenses of Defendant PNY Technologies, Inc. [Dkt. No. 12], ¶¶ 21–23.

**9.** Again, PNY admits that it was a party to the SSA and that the SSA is enforceable pursuant to its terms. Answer and Affirmative Defenses of Defendant PNY Technologies, Inc. [Dkt. No. 12], ¶¶ 21–23.

**10.** The term "the Polaroid enterprise" will be used connotatively, to signify that something was being done through one or more of the Debtor-companies without specifying which one. In response to PNY's assertion of setoff, the Trustee made an issue out of the real party in interest as to payment rights under the SSA in order to build a platform for his challenge on the mutuality element. To avoid pinning-in legal conclusions on that point before it is necessary, the vaguer reference will be used as appropriate.

poration] purchase order, change requests, or forecast updates that could reasonably cause PNY to incur liabilities for late charges or other penalties or costs . . . ."

SSA, 1–2, ¶ 2.

In turn, PNY was to be:

1. "solely responsible and liable for full support of the [Target Corporation] and other warranty claims relating to the Products";

2. "solely responsible for any situations, risks, liabilities, and claims related to charge backs, price protections and discounts, marketing development fees, late or incomplete shipments, returns, recalls, consolidation fees and charges, and similar risks relating to or arising from the sale of the Products to the [Target Corporation]"; and

3. "solely responsible for all return goods, shipping charges, shipping discrepancies, or goods that are returned for any reason (including, without limitation, so-called '*Fault Not Found*" returns) . . . ."

SSA, 3, ¶¶ 4(a)–(b), (d) (emphasis in original).

## UNCONTESTED MATERIAL FACTS

Under Count Two, the Trustee sued PNY for an alleged breach of the BLA, a failure to pay royalties due "in a sum not less than $332,287.59." Via the motion at bar, the Trustee sought a judgment for damages on this claim, but in a larger amount: $472,946.93. To make out an entitlement to judgment in this amount, the Trustee produced two declarations by James Dolan.

Before the bankruptcy filings and up to the date on which the cases were converted, Dolan was employed as Vice President and Controller of the Polaroid Corporation and its affiliated entities including PCE. After that, the Trustee employed Dolan to perform similar functions for the administration of the estate including the liquidation of assets.

Through his declaration, Dolan:

1. farmed into the record PNY's reports of sales volume (termed by him "Royalty Reports") for the second (April–June), third (July–September), and fourth (October–December) quarters, 2008;

2. attested to his calculation from those reports of royalties due for those three quarters as:

| Second | Third | Fourth |
|---|---|---|
| $132,287.59 | $ 87,153.22 | $100,000.00 (minimum)[11] |

3. attested to the fact that PNY had made no payment at all on the royalties owing for the three quarters;

---

**11.** Dolan noted that the sales-calculated royalty for the full fourth quarter would have been $12,291.81, far less than the minimum guaranteed royalty payment per § 4(a) of the BLA. As a result, he applied the amount of the $100,000.00 minimum payment. In his declaration, Dolan divided this amount on a proration, between a component accrued prepetition ($85,689.57) and one accrued postpetition ($14,130.43).

4. attested to the fact that PNY had not submitted reports of sales volume for either of the first two quarters of 2009, thereby triggering the minimum payment amount at the very least;

5. attested to how he had calculated a proration of the minimum royalty for the second quarter 2009 between amounts accrued before the sale of the Polaroid enterprise's assets to PLR closed on May 7, 2009, and his conclusion that the pre-sale component was $40,659.34;

6. attested to the fact that PNY had not paid anything to the bankruptcy estate on the royalties for the first and second quarters of 2009; and

7. attested to the total of his calculation of royalties due: $472,946.93.

PNY did not produce any admissible evidence to counter the Trustee's evidence on those points, in any of its submissions on either motion.[12] Nor did it counter the Trustee's identification of the material facts based on his theory of contractual liability from the face of the BLA. Given the lack of an issue as to these points of fact, it is **RECOMMENDED** that the district court hold that there is no genuine dispute as to these material facts, for the disposition of these motions.[13]

## PNY'S RESPONSE

For the Trustee's motion, PNY's opposition is entirely on the legal plane. PNY makes three very different arguments. One of them is a reprise of the argued basis for PNY's own motion for partial summary judgment. None of PNY's arguments go to the substantive, facial terms of the BLA, or the parties' rights or liabilities as they would be governed by those terms.

### A. Standing/Real Holder of Right of Recovery

█ PNY phrases its first defense in terms of "standing." PNY's theory, however, is not constitutionally-derived from

12. At oral argument PNY's lawyer made a belated pitch for an opportunity to conduct discovery, on the issue of whether any right to payment on these accrued royalties had been documented as passing to PLR in the 2009 asset sale, and whether PLR had treated them as such. This ploy begged a large question, in light of counsel's later concession that PLR and PNY had taken up doing business together in the very same line after the sale was closed, for the placement of goods produced after the sale. PNY would have *known then* whether PLR wanted payment *from it* on the royalties now in question, and did not need discovery from the Trustee. The same point applies with even greater strength to counsel's dither about discovery into whether the SSA itself had even been assumed and assigned to PLR. In any event, discovery into the factual matter of how PLR and PNY treated the relationship under the SSA was simply not warranted; as noted later, the Asset Purchase Agreement took care of the right to the subject royalties, as a matter of law. Finally, . to the extent that PNY had a bona fide need for discovery, its counsel failed to document in writing, with "specified 'reasons," his client's need for further discovery into the material facts in order to respond to the Trustee's evidentiary submission or the Trustee's theory of material fact. *See* Fed. R. Civ. P. 56(d).

13. Once the Trustee "point[ed] out" that the evidence known to him made out these facts and only these facts, *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), a burden of production of evidence was imposed on PNY as respondent. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To meet that burden, PNY was required to cite specific evidentiary materials in the record, Fed. R. Civ. P. 56(c)(1)(A), that could support contrary findings on the same facts, in order to "make out a genuine issue for trial," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 256, 106 S.Ct. 2505, and thus avoid judgment being granted as a matter of law pursuant to Rule 56.

Article III as the phrase usually invokes in the federal courts. Rather, PNY argues,

> [t]he Trustee lacks standing to assert the breach of contract action because the Brand License Agreement was assumed by the Buyer in conjunction with the Section 363 sale.

Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment [Dkt. No. 19], 2. Put another way: the Trustee-plaintiff here never succeeded to the right to recovery on this claim for royalties, when the case was converted after the sale had closed. As PNY would have it, the right of action passed out of the bankruptcy estate, and vested in PLR as purchaser, through the sale. Hence, PNY demands, Count Two must be "dismissed with prejudice," for want of the Trustee's right to recover for the bankruptcy estate.[14]

The argument, however, is without merit. The written terms of the court-approved sale of the assets of the Polaroid enterprise, applied in accordance with their clear facial tenor, fully bear out the Trustee's right to sue for the royalties.

The scope of the sale of the Polaroid enterprise's assets is governed by the APA, which was executed by the Debtors and PLR toward the consummation of the sale process under 11 U.S.C. § 363, plus the ancillary agreements that went to the executory contracts among those assets.[15]

Section 1.1 of the APA defines the "Acquired Assets" that PLR was purchasing. Those include (using the APA's only numeration):

(c) the "Acquired Contracts" listed on an attached schedule;

(f) all "Intellectual Property" owned by the Debtors pursuant to an Acquired Contract, or "otherwise used by" the Debtors "with the operation of the [Polaroid enterprise's] business";

(o) all of the Debtors' "Causes of Action to enforce rights in respect of any Acquired Intellectual Property," with specified exclusions;

(p) "all license fees, royalties, commissions and like payments due and owing under the Acquired Contracts *accruing after the Closing Date*" of the sale (emphasis added); and

(q) "all accounts and notes receivable of" the Debtors, with specified exclusions.

APA, 2–3 (emphasis added).

Complementing Section 1.1, the APA's Section 1.2 provides for the Debtors' retention of "Excluded Assets," and defines them to include:

(p) "all license fees, royalties, commissions and like payments owing under the Acquired Contracts and *accruing on or before the Closing Date* or otherwise attributable or relating to the period of time *on or before the Closing Date* . . . ."

APA, 5 (emphasis added).

For its argument on both motions, PNY correctly points out that the BLA was among the "Acquired Contracts" that the Debtors assigned to PLR as part of the sale. The Trustee does not (and could not) dispute this. *See* Schedule 4.1(s) to APA (identifying BLA as Contract No. 158 among Acquired Contracts).[16] That, how-

---

**14.** This argument is also the central thrust of PNY's own motion for summary judgment.

**15.** The APA and an Agreement Regarding Treatment of Certain Contracts were filed under Dkt. Nos. 273 and 274 in BKY 08–46617. They are a part of the record for these mo-

tions as Exhs. 1, 2, and 3 to the Declaration of Tyler D. Candee, Esq. [Dkt. No. 18, pp. 17 ff].

**16.** The relevant parts of this schedule were Exh. 2 to the Declaration of Tyler D. Candee [Dkt. No. 18, CM/ECF pp. 67–74].

ever, is the only component of PNY's argument that has a basis in the Asset Purchase Agreement and in the Minnesota law that applies to it.[17]

PNY argues that the accrued pre-sale royalties went to PLR right along with its "Acquired Contract," by the sweep of two generalized provisions of the Asset Purchase Agreement. First, it argues, the BLA was an "Acquired Intellectual Property Contract," and hence the accrued royalties fell under the "causes of action to enforce rights in any Acquired Intellectual Property," APA at Section 1.1(*o*).[18] Second, it would classify the accrued royalties as an account receivable, APA at Section 1.1(g). PNY argues that all rights to payment or rights of suit under or through the BLA fell within the sweep of these two categories; they went to PLR in the sale; and the Trustee may not sue to recover on account of them.

The first argument is wrong as a matter of the logic of classification. It confuses the more narrow, contractually-based rights of a *licensor* of intellectual property to enforce the terms of the license *against the licensee*, with the *plenary* rights of an *owner* of intellectual property to protect and vindicate the value of its ownership *against all the world.*

Yes, absent the APA's more exacting scheme of classification, there would be a broad, impressionistic argument to characterize a right to unpaid royalties as a right to recover part of the value of the basic ownership of the intellectual property under license. This would require jumping over a crafted, intermediate level of organization for rights and liabilities (the BLA); but it would be arguable.

However, the APA specifically identifies "royalties," in that very word, that are derived from the licensure of intellectual property under an Acquired Contract, as a separate class of treated asset. It recognizes segregated value traceable to such royalties. Most to the point, it allocates that value between seller and buyer in express terms, with the seller to retain the fruit grown off the tree before sale and the buyer to take all ripening thereafter.

This embodies an exacting and deliberate analysis of the components of value in an ongoing, complex contractual relationship like the BLA. Thanks to the powerful remedies of 11 U.S.C. § 365, that relationship could be transferred to a new owner even as it continued to throw off realized value (the royalties) through performance. Responding to the complexities of this moving and operating asset, the parties to the APA carefully made specific provision for its multiple parts, for the transition to a new, post-sale ownership.

There are three reasons why this specific provision for the estates' retention takes precedence over the APA's generally-framed categories of acquired assets.

The first stems from contract, the specific agreement of the parties to the APA. Section 1.2 of the APA governs the assets to be retained by the Debtors as sellers. It opens with the qualifying proviso, "[n]otwithstanding anything to the contrary in this Agreement,...." This clearly expresses the thought that the following, specific provisions for *retention* were to override the effect otherwise to be had from all general provisions for *transfer* of assets.

---

**17.** *See* APA, Section 10.4 (APA is to be "construed, performed and enforced in accordance with, and governed by" Minnesota law).

**18.** The BLA does *not* use "Acquired Intellectual Property Contract" as a defined term.

The second lies in generally-applicable law. As a matter of fundamental interpretation of contract, the very specific treatment of an identified category of property—accrued royalties—takes precedence over the APA's provision for the more generalized category of rights to recover damages for any infringement on ownership rights in property. *E.g., Campbell–Sevey, Inc. v. Delta–T Corp.*, 2010 WL 1411118, *9 (D.Minn.2010) (citing Restatement (Second) of Contracts § 203(c)).

■ And a third also comes from the general law of contract. "Each and every provision of a contract must be given effect if that can be consistently and reasonably done." *Advantage Consulting Grp., Ltd. v. ADT Sec'y Systs., Inc.*, 306 F.3d 582, 586 (8th Cir.2002) (quoting *Oster v. Medtronic, Inc.*, 428 N.W.2d 116, 119 (Minn.Ct. App.1988). The carveout of unpaid, pre-sale royalty payments in Sections 1.1(p) and 1.2(p) of the APA would be rendered entirely superfluous, were PNY's argument adopted; and that would be contrary to the governing Minnesota law.[19]

The same reasoning applies to the second argument. Outside of context, a right to recover royalties on a licensure of intellectual property might be classified as an "account receivable." However, this would only be in a generalized, connotative sense. *E.g.*, Bryan A. Garner, *Garner's Dictionary of Legal Usage* (3d ed.2011), 14 (defining "account" as "a detailed statement of the debits and credits between parties to a contract...."). The parties to the APA did not envision the governance of such generalities here. They clearly took account of the special and valuable place of ongoing, royalty-producing licenses of the Polaroid branding in the asset structure that was being sold.[20] After clearly denoting the revenue generation from them as a separate class of asset deserving of specific treatment, they divided it between buyer and seller using a bright line. A right to royalties unpaid but accrued as of the date of the sale might be termed a "credit" to the licensor in an abstract sense, and by extension the contractual right to realize on it might be an "account." But the parties to the sale clearly had more fine-tuned intentions. They expressly left those royalties that were unpaid through closing in the bankruptcy estate, for recovery and administration for the benefit of the Debtors' creditors.

PNY's argument of law to defeat the Trustee's full suit fails. The right to these royalties reposes in the bankruptcy estate and the Trustee has the right to sue to recover on them. The Trustee should receive a ruling to that effect; and because this issue was the only one raised by PNY in its motion for summary judgment, PNY's motion should be denied.

### B. Setoff and Recoupment

■ As its Fifteenth Affirmative Defense, PNY asserted that it was "entitled to set off and/or recoup any indebtedness due by the Debtor to [PNY] against such liability." Answer and Affirmative Defenses of Defendant PNY Technologies, Inc. [Dkt. No. 12], 6. It raises this defense in response to the Trustee's motion for summary judgment, maintaining that the

---

**19.** PNY's lawyer also argued that the interaction among the APA's treatment of Acquired Contracts, Acquired Intellectual Property, and accounts receivable, in their combined complexity, somehow created a priming specific provision for unpaid royalties. This pitch was so facially non-meritorious that it does not merit discussion.

**20.** With no manufacturing being directly operated or contracted by the Polaroid enterprise itself, and development of new products stalled by lack of capital, those contracts and royalties were all there was—in terms of *current* revenue generation.

amount of any judgment in favor of the estate(s) must be reduced by the amount of the claim that it asserted against the estate(s) by filing a proof of claim.[21]

The Trustee's rejoinder to that was the filing of an objection to PNY's claim in BKY 08–46617, shortly before the hearing on these motions. This strategic ploy was directed in part against PNY's assertion of setoff and recoupment, on various theories including ripeness.

Most of those are mooted by the intervening hearing on the claim objection and today's entry of a dispositive order on it [BKY 08–46617, Dkt. No.2070]. That disposition left a claim in the amount of $111,713.60 allowed against the estate to the Polaroid Corporation, founded on multiple invoices issued up to August 10, 2008 on PNY's performance under the SSA. Because this claim arose in transactions that were executed before the Debtors' bankruptcy filings, it is a general unsecured, pre-petition claim for the purposes of PNY's affirmative defenses.

As a counter to the Trustee's relief, PNY would have this allowed claim set off against the Trustee's judgment, reducing or extinguishing the amount it would have to pay to the estate in satisfaction.

■ 11 U.S.C. § 553 generally preserves the right of setoff that a creditor could have raised against its debtor under nonbankruptcy law. Subject to exceptions not relevant here, it provides:

> . . . this title [the Bankruptcy Code] does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under [the Bankruptcy Code] against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—
>
> (1) the claim of such creditor against the debtor is disallowed. . . .

11 U.S.C. § 553(a). This provision preserves setoff rights that are otherwise valid under applicable nonbankruptcy law. *In re Nerland Oil, Inc.*, 303 F.3d 911, 917 (8th Cir.2002); *In re American Central Airlines, Inc.*, 60 B.R. 587, 590 (Bankr. N.D.Iowa 1996).

■ Under Minnesota law, the elements for setoff have been identified as two debts owing, one by the debtor to the creditor and one by the creditor to the debtor; and the mutuality of those debts. *See Nietzel v. Farmers and Merchants State Bank*, 307 Minn. 147, 238 N.W.2d 437 (1976); *Firstar Eagan Bank v. Marquette Bank*, 466 N.W.2d 8, 12 (Minn.Ct. App.1991). The two existing debts must each be due at the time of setoff, and the debts must be mutual. *Firstar Eagan Bank v. Marquette Bank*, 466 N.W.2d at 12.

> Mutuality requires that something be "owed" by both sides. To be mutual, the court must find that: (1) the debts are in the same right; (2) the debts are between the same parties; and (3) the parties stand in the same capacity.

*In re Donnay*, 184 B.R. 767, 787 (Bankr. D.Minn.1995) (citations omitted).

■ In the context of bankruptcy, the Eighth Circuit has articulated these ele-

---

21. PNY actually filed two proofs of claim, specifying the case of the Polaroid Corporation as the one in which the claim was being asserted. Their filing spanned the conversion of the cases. The substantive content of the proofs of claim was identical. At the hearing on the Trustee's claim objection, PNY's counsel admitted the second proof of claim was duplicative, and represented that it would be withdrawn. That was never done, so the second claim was disallowed today. Order Re: Trustee's Objection to Filed Claims of PNY Technologies, Inc. (Claims Nos. 34 and 188) [BKY 08–46617, Dkt. No.2070], 15.

ments in essentially the same way, adding a temporal overlay relating to the time of the bankruptcy filing:

> 1. A debt exists from the creditor to the debtor and that debt arose prior to the commencement of the bankruptcy case.
>
> 2. The creditor has a claim against the debtor which arose prior to the commencement of the bankruptcy case.
>
> 3. The debt and the claim are mutual obligations.

*United States v. Gerth,* 991 F.2d 1428, 1431 (8th Cir.1993).

 Then, under Minnesota law setoff can be applied to cross-running claims in litigation between parties where both sides are adjudicated liable to the other—much in the sense of counterclaim, with which the concept and terminology of setoff are often used interchangeably. *Imperial Elevator Co. v. Hartford Acc. & Indem. Co.,* 163 Minn. 481, 204 N.W. 531 (1925). As a tool of equity, setoff may be used by a court in its discretion, to net out liquidated cross-running claims for a final consolidated judgment. *Hogren v. Schlueter,* 355 N.W.2d 762, 764 (Minn.Ct. App.1984).

 Finally (and quite relevant here), when a trustee in bankruptcy sues a creditor on a matured debt that is property of the estate and establishes the creditor's liability, the creditor's pre-petition claim against the debtor (if allowable against the estate) may be offset against the creditor's adjudicated liability to the estate. 11 U.S.C. § 542(b).

As an alternate defense to the Trustee's recovery under the BLA, PNY asserted a right to set off its pre-petition claim under the SSA against the amount of any judgment the Trustee received against it. The Trustee opposed this, and preemptively sought a ruling through his own motion for summary judgment.

The Trustee's legal theory—lack of mutuality—was partly miscast, given the sole basis raised: PNY's claim in these cases, if any, was allowable only against the estate of PCE, due to a novation of the SSA. The Trustee argued that the parties had effected this novation by their consistent performance under the SSA, when PCE acted as the sole party to serve, do the work, and undertake subsidiary transactional liability to the Target Corporation for the placement of PNY's Polaroid-branded products. Thus, the Trustee insisted, PNY's claim should not be allowed against the estate of the Polaroid Corporation, because the Polaroid Corporation had no de facto involvement with PNY after it executed the SSA and therefore PNY had no enforceable claim against it. From this, the Trustee argued, the Polaroid Corporation's BLA-based claim against PNY could not be reduced by the offset of PNY's SSA-based claim, because PNY's claim legally lay against PCE only.[22]

The Trustee made this theory one of his substantive bases for objecting to PNY's filed claim, which PNY had designated as running against the Polaroid Corporation alone. In today's ruling, the Trustee lost. PNY's claim was allowed against the estate of the Polaroid Corporation, though in a reduced amount due to the disallowance of its major part.[23]

---

**22.** In the sense mentioned in the quoted text from *In re Donnay,* there was a lack of "mutuality." But, really, the point would go more to the other requirement for setoff, crossrunning claims, in the sense of Claimant A vs. Claimant B and Claimant B vs. Claimant A.

The element could not be satisfied when one of the claims was Claimant B vs. Claimant *C*.

**23.** The disallowance was in an amount corresponding to chargebacks that the Target Corporation had made against prior invoiced

Thus, there are true cross-running debts, as between the same parties. The Trustee has not disputed mutuality on any other ground, and could not.[24] The elements for setoff are established; and what is more, this situation appears to be just what is contemplated by § 542(b), toward entry of a final netted judgment. Because the amount of the judgment to which the Trustee is entitled is greater than the amount of PNY's allowed claim, the estate of the Polaroid Corporation should still receive a substantial judgment against PNY.[25]

### C. Recovery of Post–Petition Royalties Not Enumerated in Amended Complaint

■ As a last ground of resistance to the Trustee's motion, PNY points to the difference between the amount of damages pleaded in the prayer for relief in the Trustee's amended complaint and the greater amount he now seeks to have awarded on motion.

PNY's first objection is couched in procedural terms: the enhancement of the number "is an improper attempt to amend its [sic] Amended Complaint to increase the alleged damages by approximately $140,000 (in violation of Rule 7015 of the Federal Rules of Bankruptcy Procedure)." Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment [Dkt. No. 19], 8.

This was a curious argument. It was redolent of the old, hypertechnical "forms of action" approach of the common law on pleading, that prevailed before the adoption of the first modern procedural codes in the mid–19th Century. In any event, as the Trustee notes, it is met conclusively by Fed. R. Civ. P. 54(c):

> A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings. Every other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.[26]

The Trustee proved up a right to damages in the greater amount, so he is entitled to a corresponding judgment.

The other objection to the enhanced demand for damages is more nebulous. Per PNY, the request for an award linked to post-petition royalties is "based solely on conjecture," because the Trustee had no reports of sales to analyze for the calculation of a specific amount under the BLA's formula.

This, too, was a strange argument. The Trustee had to resort to the BLA's minimum-royalty provision because PNY had defaulted in its duty to report. PNY had no cause to complain, if the Trustee shrugged, assumed a continuing downward "trajectory" in royalties, and did not bother to push the issue of PNY's delinquent reports.

■ In any case, from PNY's perspective the point is defused by no-harm, no-foul considerations. By resorting to the estates' right to a minimum payment, the

---

shipments of PNY-produced goods, and for which it had withheld payment to PCE. In making a claim in the bankruptcy case, PNY was tacitly asserting a right to be made whole for the chargeback. However, the SSA expressly imposed on PNY the risk of *all* customer chargebacks.

**24.** Under *Donnay*'s description, *supra* at p. 19, mutuality is obviously satisfied when both debts are regular, ordinary-course, unsecured trade debts like both were here.

**25.** As a result, it is not necessary to address PNY's invocation of recoupment.

**26.** Fed. R. Bankr. P. 7054(a) makes this rule applicable to adversary proceedings.

Trustee waived any claim to royalties in a larger amount were PNY's actual sales experience to support that. It was not as if the Trustee were being gracious in not pressing for the reports or pursuing greater damages; rather, it was a hard-headed cost-benefit analysis, with much of the "bird in the hand" approach behind it. In any event, the Trustee was under no obligation to put the resources of the bankruptcy estate into pushing for more. His strategic election does not make his insistence on the contractual minimum conjectural at all. The issue will be put to an end, for the two periods; and estoppel will now bar the Trustee from seeking further royalties for those two periods.

### D. Outcome

Under this analysis, the Trustee would be entitled to a recovery under Count Two of his amended complaint in the amount of $472,946.93, for the benefit of the bankruptcy estate of Debtor Polaroid Corporation. PNY would be entitled to an offset against that, on account of its allowed claim in the case of Debtor Polaroid Corporation, to the extent of $111,713.60. The outcome would be a netted judgment in favor of the Trustee against PNY, in the amount of $361,233.33.

### RECOMMENDATION

IT IS RECOMMENDED that the district court adopt the report just made in disposition of the parties' cross-motions for summary judgment on Count Two of the Plaintiff's complaint, and that it enter, as follows, an:

### ORDER FOR JUDGMENT

On Count Two of his amended complaint, the Plaintiff shall recover from the Defendant, for the benefit of the estate of Debtor Polaroid Corporation, BKY 08–46617, the amount of $361,233.33, together with taxable costs and disbursements.

IT IS FURTHER RECOMMENDED that the district court determine that there is no just reason for delay, and order entry of judgment in the district court now.[27]

### SO RECOMMENDED

---

27. Counts One and Three of the Trustee's complaint have not yet been submitted for decision. Both of those counts are "core proceedings" in the underlying bankruptcy case. *Supra*, p. 4. As such, both of those counts are subject to entry of judgment at the direction of a bankruptcy judge. 28 U.S.C. § 157(b)(1). Ordinarily, entry of judgment now on only one count of a multi-count complaint would trigger concern over the prospect of piecemeal appeals, a problem ad-dressed in part by Fed. R. Civ. P. 54(b). However, PNY's refusal to allow the submission of all issues to final decision by a bankruptcy judge creates an anomaly as to where judgment should be entered, and whether it may be entered in only one judicial unit of the district, i.e., the district court or the bankruptcy court. Therefore, it is respectfully suggested that each "track" of this litigation be directed to its own path for entry of judgment, on submission to the court.